UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

TERRENCE KEITH PAYNE,

Petitioner,

v. Case No. 3:23-cv-635-MMH-LLL

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

Respondents.

---

**ORDER**

**I. Status**

Petitioner Terrence Keith Payne, an inmate of the Florida penal system, filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Doc. 1).[1] Payne challenges a 2017 state court judgment of conviction for sexual battery with a deadly weapon in Duval County, Florida, and raises four grounds for relief. Respondents submitted a memorandum in opposition to the Petition supported by exhibits (Doc. 17), and Payne filed a reply. (Doc. 20). This action is ripe for review.

[1] For purposes of reference to pleadings and exhibits, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

## II. Relevant Procedural History

After a jury found Payne guilty of sexual battery with a deadly weapon (Doc. 17-1 at 162–63), the trial judge sentenced Payne to life in prison. (Doc. 17-1 at 208–14). The state appellate court affirmed the conviction and the sentence in a decision without a written opinion. Payne v. State, 284 So. 3d 438 (Fla. 1st DCA 2019) (table). Payne filed a motion for post-conviction relief under Rule 3.850, Florida Rules of Criminal Procedure (Doc. 17-12 at 6–59), the post-conviction court denied the motion without an evidentiary hearing (Doc. 17-12 at 161–73), and the state appellate court affirmed in a decision without a written opinion. Payne v. State, 344 So. 3d 403 (Fla. 1st DCA 2022) (table). Payne's federal petition followed.

In 2016, the prosecutor filed an information charging Payne with sexual battery with a deadly weapon and alleging that the crime occurred twenty years earlier in 1996. (Doc. 17-1 at 31). At trial, the prosecutor presented the following evidence. M.T. testified that she lived with her two daughters, K.T. and D.T., and that on October 18, 1996, she stayed home, while her two daughters left to spend time with two male friends. (Doc. 17-2 at 183–85). Later that evening around 10:00 P.M. or 11:00 P.M., M.T. fell asleep. (Doc. 17-2 at 185). Around 4:00 A.M. or 5:00 A.M. the next morning, M.T. woke up when a

male wearing a mask held a knife to her neck. (Doc. 17-2 at 186–87). The male cut M.T.'s hands, face, and neck while M.T. tried to push him off her. (Doc. 17-2 at 187–89). During the struggle, the male raped M.T. on the floor by placing his penis in her vagina. (Doc. 17-2 at 187–88). After raping M.T., the male exited the home through the front door and left in a "late model car." (Doc. 17-2 at 192). The front door of M.T.'s home, the door frame, and the door lock were not damaged. (Doc. 17-2 at 193, 238, 257). A drawer in the kitchen where M.T. kept knives was open. (Doc. 17-2 at 194). At a hospital, a nurse treated M.T.'s injuries and administered a sexual assault examination. (Doc. 17-2 at 197). Before the rape, M.T. had not engaged in sex for two years. (Doc. 17-2 at 197). During an interview with police, M.T. described the perpetrator as a black male, five feet, five inches to five feet, eight inches, 140 to 160 pounds, and dressed in a gray Polo shirt and khaki shorts. (Doc. 17-2 at 246–47). She described the perpetrator's car as a 1970s Buick with a white top. (Doc. 17-2 at 246–47, 249–50). Although she was unable to see the male's face, she thought that Payne was the perpetrator. (Doc. 17-2 at 198, 275). Payne was her daughter's boyfriend at the time, and she had met Payne a few times before the rape. (Doc. 17-2 at 198–99, 211–12).

K.T., M.T.'s daughter, testified that Payne and Preston Garrett, who was her sister's boyfriend, picked her and her sister up that evening in an older model Mercury Grand Marquis. (Doc. 17-2 at 214). The four rented a motel room and drank alcohol, and Payne left the motel room by himself around midnight in the Grand Marquis, did not return that evening, and did not respond to K.T.'s calls to his pager. (Doc. 17-2 at 214–15, 226–27). K.T. had left a key to the front door of her home in the Grand Marquis. (Doc. 17-2 at 217–18). When K.T. learned about the crime, she told a police officer that Payne raped her mother because Payne left the motel room that evening, had access to a key to the front door of her home, did not respond to her calls to his pager, and drove a car that matched the description of the car that her mother saw the perpetrator drive after the crime. (Doc. 17-2 at 218–19).

The police officers investigating the crime did not find the knife wielded by the perpetrator. (Doc. 17-2 at 262–63). The nurse who conducted the sexual assault examination observed cuts on M.T.'s face, neck, and fingertips, but did not observe any injuries to her vagina. (Doc. 17-2 at 301–02, 304). She swabbed M.T.'s mouth, vagina, and cervix, and used a microscope to observe sperm on the swabs. (Doc. 17-2 at 302–06). A detective obtained the swabs from the

nurse; however, the detective did not submit the swabs for testing and did not interview M.T.'s daughters or Garrett. (Doc. 17-2 at 274–76, 284, 288–90).

In 2015, almost seventeen years after the rape, a detective who was assigned cold cases submitted the swabs for testing, obtained a DNA sample from Payne, and interviewed M.T., K.T., and Payne. (Doc. 17-2 at 313–20). During the interview, Payne admitted that he dated K.T., initially denied knowing M.T., but later admitted to knowing a person named M.T. (Doc. 17-2 at 318). During a second interview while in custody, Payne waived his constitutional rights, looked at a photograph of M.T., and denied knowing or ever engaging in sex with M.T. (Doc. 17-2 at 321–25). A DNA profile from semen on the vaginal swab and a partial DNA profile from semen on the cervical swab matched Payne's DNA profile. (Doc. 17-2 at 349–51, 353–55, 373–74, 376–77, 380). The frequency of random occurrence for both DNA matches was one in seven hundred billion persons. (Doc. 17-2 at 375, 377).

During Payne's case in chief, Garrett, a twice convicted felon, testified that he, Payne, K.T., and K.T.'s sister used to rent motel rooms for drinking alcohol and engaging in sex. (Doc. 17-2 at 397–98). He regularly drove Payne, K.T., and K.T.'s sister to the motel, he never lent his car to Payne, and he always kept his car key in his pocket. (Doc. 17-2 at 399, 404). According to

Garrett, Payne never left the motel room or borrowed his car, and he, Payne, K.T., and K.T.'s sister always arrived and left a motel room together. (Doc. 17-2 at 399–400, 404). He would have remembered if Payne took his car without his permission and did not return. (Doc. 17-2 at 405–06). At the time, Garrett owned an older blue and white Mercury Grand Marquis. (Doc. 17-2 at 403). However, Garrett did not specifically remember what occurred on the evening that M.T. was raped. (Doc. 17-2 at 398).[2]

## III. One-Year Limitations Period

This action was timely filed within the one-year limitations period. See 28 U.S.C. § 2244(d).

## IV. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to

[2] Because the crime occurred in 1996, Florida's 1994 sentencing guidelines applied and required a prison sentence between eight years and thirteen years. (Doc. 17-1 at 224). Before trial, the prosecutor notified Payne of the intent to request an upward departure based on five aggravating factors. (Doc. 17-1 at 78). To comply with Apprendi v. New Jersey, 530 U.S. 466 (2000), the trial judge held a separate penalty proceeding and asked the jury to determine whether the prosecutor proved the aggravating factors beyond a reasonable doubt. (Doc. 17-1 at 160). After the jury determined that the prosecutor proved all five aggravating factors beyond a reasonable doubt (Doc. 17-1 at 162–63), the trial judge departed upward to impose the life sentence. (Doc. 17-1 at 224–31).

grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318–19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because the Court can "adequately assess [Payne's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.[3]

[3] In his § 2254 Petition, Payne asserts that the post-conviction court and the state appellate court violated his federal right to due process by refusing to grant him an evidentiary hearing. (Doc. 1 at 9, 11, 13, 15). "Federal habeas relief is available to remedy defects in a defendant's conviction and sentence, but 'an alleged defect in a collateral proceeding does not state a basis for habeas relief.'" Alston v. Dep't of Corr., Fla., 610 F.3d 1318, 1325 (11th Cir. 2010) (quoting Quince v. Crosby, 360 F.3d 1259, 1262 (11th Cir. 2004)). Consequently, a federal due process claim based on the state court's failure to grant an evidentiary hearing is without merit.

## V. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), abrogation recognized on other grounds by Smith v. Comm'r, Ala. Dep't of Corr., 67 F.4th 1335, 1348 (11th Cir. 2023). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)). As such, federal habeas review of final state court decisions is "greatly circumscribed and highly deferential." Id. (internal quotation marks omitted) (quoting Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. See Marshall v. Sec'y, Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is

unaccompanied by an explanation, the United States Supreme Court has instructed:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

Wilson v. Sellers, 584 U.S. 122, 125 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. Id. at 125–26.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Richter, 562 U.S. at 97–98. The Eleventh Circuit describes the limited scope of federal review pursuant to § 2254 as follows:

First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413, 120 S. Ct. at 1523 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 571 U.S. 12, 18 (2013); accord Brumfield v. Cain, 576 U.S. 305, 322 n.8 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" Titlow, 571 U.S. at 18 (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)).

Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016) (internal citations modified). Also, deferential review under § 2254(d) generally is limited to the record that was before the state court that adjudicated the claim on the merits. See Cullen v. Pinholster, 563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made").

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Titlow, 571 U.S. at 19. "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" Tharpe, 834 F.3d at 1338 (quoting Richter, 562 U.S. at 102–03). This standard is "meant to be" a "difficult" one to meet. Richter, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

### B. Exhaustion/Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court

remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[ ]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365–66, 115 S. Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman,[4] supra, at 747–48, 111 S. Ct. 2546; Sykes,[5] supra, at 84–85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); Beard v. Kindler, 558 U.S. --, --, 130 S. Ct. 612, 617–18, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. See Coleman, 501 U.S., at 750, 111 S. Ct. 2546.

[4] Coleman v. Thompson, 501 U.S. 722 (1991).

[5] Wainwright v. Sykes, 433 U.S. 72 (1977).

Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." McCoy v. Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting Carrier, 477 U.S. at 488, 106 S. Ct. 2639).[6] Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." Id. at 1261 (quoting Carrier, 477 U.S. at 494, 106 S. Ct. 2639).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the

[6] Murray v. Carrier, 477 U.S. 478 (1986).

continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

### C. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [Strickland,] 466 U.S. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id. at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687.
>
> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

Richter, 562 U.S. at 104 (internal citations modified). The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward, 592 F.3d at 1163. Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." Richter, 562 U.S. at 105. But "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Id. (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." Knowles v. Mirzayance, 556 U.S.

> 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105.

Hittson v. GDCP Warden, 759 F.3d 1210, 1248 (11th Cir. 2014) (internal citations modified). In other words, "[i]n addition to the deference to counsel's performance mandated by Strickland, the AEDPA adds another layer of deference—this one to a state court's decision—when we are considering whether to grant federal habeas relief from a state court's decision." Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

## VI. Findings of Fact and Conclusions of Law

### A. Ground One and Sub-claim A of Ground Four

As Ground One and Sub-claim A of Ground Four, Payne asserts that trial counsel deficiently performed by not objecting to testimony by the DNA expert who opined that DNA profiles from the semen on the swabs matched Payne's DNA profile. (Doc. 1 at 9, 15). He contends that trial counsel failed to investigate and learn about the statistical method used by the DNA expert to

form her opinion. (Doc. 1 at 9, 15). The post-conviction court denied the claim as follows:

> Defendant alleges that prior to trial, he informed counsel he did not commit the charge, he was innocent, and the DNA test results were incorrect, but counsel failed to investigate with further DNA testing or familiarize himself with the "statistical analysis component of DNA" in order to challenge the expert's testimony. He contends that DNA was the only evidence used to identify him as the perpetrator, as there was no physical evidence or eyewitness. He concedes that the expert's evaluation indicated his DNA matched that from the "crime scene, 'victim,' sexual assault kits," with "the frequency statistic and probability calculation being one in seven hundred billion," but argues that counsel's omission caused this testimony to go unrebutted. He argues:
>
>> Counsel failed to challenge the reliability of the DNA, DNA test, and statistical analysis component of the DNA, which would have been sufficient to produce reasonable doubt in this case, because questions exist about whether or not the 'database used' for or of African American, Caucasian, or any other ethnic group is reliable or unreliable [and] would be corrupted by knowing whether they're from a particular region, area, or from a general group. Also, siblings, relatives, or ancestral heritage, because of their similarities in DNA profiles.
>
> He also argues that due to variations in the nature and quality of DNA evidence, there is no guarantee a test will produce reliable results each time it is used, and

"case specific issues and problems often greatly affect the quality and relevance of DNA test results," thus potentially leading to false positives. Finally, he argues:

> [I]t is virtually impossible or impractical to draw a large enough population to test calculated frequencies for any particular DNA profile, because there is not a sufficient body of empirical data on which to base a claim that such frequency calculations are reliable or valid per se, so the methodology has to be generally accepted within scientific community.

Defendant's position is that if counsel had presented this information to the jury, it would have been sufficient to produce reasonable doubt as to the reliability of the DNA evidence and thus, the jury's verdict, because the sole issue at trial was the reliability of that DNA evidence. This claim lacks merit.

> "DNA test results are generally accepted as reliable in the scientific community, provided that the laboratory has followed accepted testing procedures that meet the Frye test to protect against false readings and contamination." Hayes v. State, 660 So. 2d 257, 264–65 (Fla. 1995).
>
> "[T]he expert need not be a statistician himself to testify as to the statistical results." Branch v. State, 952 So. 2d 470, 483 (Fla. 2006) (per curiam) (citation omitted); see also Darling v. State, 808 So. 2d 145, 158 (Fla. 2002) (per curiam) ("The fact that [the DNA expert] was not,

> himself, a statistician is not a sound basis to exclude his expert testimony regarding the statistical results." (citing cases)). Furthermore, "admissibility is not contingent upon the expert having compiled the database himself." Branch, 952 So. 2d at 483 (citation omitted).

Jimenez-Solano v. Sec'y Fla. Dep't of Corr., No. 1:16-cv-10073-JLK-PAW, 2018 WL 9801185, at *15 (S.D. Fla. Mar. 12, 2018), report and recommendation adopted sub nom, Jimenez-Solano v. Jones, No. 1:16-cv-10073-JLK-PAW, 2018 WL 9801134 (S.D. Fla. Aug. 30, 2018).

Finally, with regard to the statistical analysis of population frequencies, a method known as the Product Rule is recognized in Florida as a generally accepted method of DNA calculations. Thomas v. State, 22 So. 3d 626, 626 (Fla. 1st DCA 2009) (citing Butler v. State, 842 So. 2d 817, 829 (Fla. 2003)).

In the instant case, Taylor Templin, a former forensic DNA analyst with Cellmark Forensics (a private DNA laboratory), testified as follows: Cellmark is an accredited lab, and STR[7] DNA analysis is generally accepted in the scientific community. She obtained a DNA profile from the sperm fraction of the victim's vaginal swab and shared the findings with the Florida Department of Law Enforcement. Her testimony as a whole demonstrates that the lab "followed accepted testing procedures that meet the Frye[1] test to protect against false readings and contamination." Hayes, 660 So. 2d at 265.

[7] STR refers to the "Short Tandem Repeats" method of DNA analysis. United States v. Morrow, 374 F. Supp. 2d 51, 54, 58 (D.D.C. 2005).

> [1] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).
>
> Next, Emily Varan, a senior crime laboratory analyst in FDLE's forensic biology section, testified as follows: She performed STR DNA testing on a cheek swab obtained from Defendant and obtained a full profile. The foreign profile obtained from the victim's vaginal swabs matched Defendant's DNA profile within a reasonable degree of scientific certainty. Using the "Product Rule to get a total frequency of how common or rare that profile is," she concluded that the profile was rarer than one in seven hundred billion individuals. The analysis used to reach this conclusion regarding statistical significance is accepted in the scientific community. Her testimony as a whole demonstrates that the FDLE lab also "followed accepted testing procedures that meet the Frye test to protect against false readings and contamination." Hayes, 660 So. 2d at 265.
>
> The testimony of the State's experts established the general acceptance in the scientific community of the methodology used to calculate the frequency of Defendant's DNA profile. There is no reasonable probability that counsel could have successfully challenged the reliability of the DNA test results or the testimony of the State's experts by obtaining additional testing or presenting the testimony of a different expert.
>
> (Doc. 17-12 at 162–65) (state court record citations omitted).

Whether the testimony by the experts was admissible under Florida Statutes section 90.702, the state rule of evidence that governs expert

testimony, is an issue of state law, and a state court's determination of state law receives deference in federal court. Calhoun v. Warden, Baldwin State Prison, 92 F.4th 1338, 1352 (11th Cir. 2024) ("[T]he source of absolute deference to state supreme courts on state law issues . . . is grounded [ ] in fundamental tenets of federalism and the dichotomy of state and federal law that shapes our federal-state system. And it is compelled by [a] dozen or so decisions of the Supreme Court and this Court[.]"). Because Payne's trial occurred in 2017, the standard in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), applied.[8]

Under section 90.702, a party who intends to introduce testimony by an expert must lay a predicate as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion or otherwise, if:

[8] In 2013, the Florida legislature replaced the standard under Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), with the Daubert standard by amending section 90.702. See § 90.702, Fla. Stat. (2017) historical and statutory notes. In 2018, DeLisle v. Crane Co., 258 So. 3d 1219, 1229 (Fla. 2018), held that, because the amended section 90.702 violated Florida's constitution, the Frye standard applied to expert testimony in a Florida court. In 2019, In re Amends. to Fla. Evidence Code, 278 So. 3d 551 (Fla. 2019), re-adopted the Daubert standard. Because Payne's trial occurred in 2017, after the 2013 amendment but before DeLisle, the Daubert standard applied.

> (1) The testimony is based upon sufficient facts or data;
>
> (2) The testimony is the product of reliable principles and methods; and
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

§ 90.702, Fla. Stat. (2017).

"In Daubert, the United States Supreme Court charged trial courts with assuming the role of gatekeeper and making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" Torrez v. State, 294 So. 3d 390, 400–01 (Fla. 4th DCA 2020) (quoting Daubert, 509 U.S. at 592–93). "Daubert provides that expert testimony is admissible if it is relevant and reliable." Torrez, 294 So. 3d at 401. "The exception to the Daubert analysis is in cases involving evidence of a kind so familiar and accepted as to require no foundation to establish the fundamental reliability of the system." Torrez, 294 So. 3d at 401.

Here, a forensic DNA analyst at Cellmark Forensics testified that Cellmark required her to take a training course before becoming an analyst, that Cellmark administered DNA proficiency tests twice a year, and that she

had successfully completed sixteen proficiency tests. (Doc. 17-2 at 338–39). National and state crime laboratory boards and health departments had accredited Cellmark for over twenty years. (Doc. 17-2 at 340). Also, before testing, an analyst at Cellmark regularly uses several quality assurance measures to ensure that a result is reliable. (Doc. 17-2 at 340–41). The Cellmark analyst used STR DNA analysis to extract a DNA profile from sperm on the vaginal swab from M.T. (Doc. 17-2 at 343–44, 351, 354). The Cellmark analyst's results were "technically reviewed and admin[istratively] reviewed." (Doc. 17-2 at 355). The Cellmark analyst testified that STR DNA analysis is a method used most by forensic laboratories and generally accepted in the scientific community. (Doc. 17-2 at 343).

A crime laboratory analyst for the Florida Department of Law Enforcement (FDLE) testified that FDLE requires both formal training in STR DNA testing and DNA proficiency testing twice a year and that during her seventeen years as an analyst she completed written examinations, laboratory practice, and continuing education, and received training from supervisors. (Doc. 17-2 at 360–61, 364). Also, a national crime laboratory society accredits the FDLE. (Doc. 17-2 at 365). After an FDLE analyst conducts DNA testing, another analyst, a technical reviewer, and a supervisor review the results.

(Doc. 17-2 at 362–63). If the results need clarification, the person reviewing the results will return the results to the FDLE analyst. (Doc. 17-2 at 363–64). The FDLE analyst in Payne's case used STR DNA testing to extract a DNA profile from a swab of Payne's cheek. (Doc. 17-2 at 370–72). The FDLE analyst determined that the DNA profile from the swab of Payne's cheek matched the DNA profile from the sperm on the vaginal swab from M.T. (Doc. 17-2 at 373, 380). Also, the FDLE analyst used STR DNA analysis to extract a partial DNA profile from sperm on a cervical swab from M.T. and determined that Payne's DNA profile matched the partial DNA profile. (Doc. 17-2 at 376–77, 380). The FDLE analyst confirmed that the other analyst, the technical reviewer, and her supervisor reviewed the results and did not return the results for clarification. (Doc. 17-2 at 375–78). The FDLE analyst testified that STR DNA analysis is used by most forensic laboratories in the United States and that she first started using STR DNA analysis in 1998. (Doc. 17-2 at 361–62).

The FDLE analyst explained how she determined the frequency of occurrence for the match between Payne's DNA profile and the DNA profile from the sperm on the vaginal swab:

> [Prosecutor:] Now, did you then, Ms. Varan, go on to determine the frequency of occurrence of that male profile?

[Analyst:] Yes.

[Prosecutor:] And could you explain to the jury what we mean by that or what you mean by that?

[Analyst:] Yes. With — with a match if someone's excluded or they don't match, it ends there, but if someone matches, well, what's the statistical significance of that match, how discriminating is that match? And the more markers that you have that match someone, the more discriminating that profile is because we're able to multiply those individual frequencies of each marker together using the Product Rule to get a total frequency of how common or rare that profile is, and with the statement that I used, a reasonable degree of scientific certainty, to qualify to say that the profile is rarer than one in seven hundred billion individuals and seven hundred billion is a hundred times the population of the Earth, and that's why I can say that statement.

[Prosecutor:] Ms. Varan, is the analysis and the statistical significance, are these numbers something that is accepted in the scientific community?

[Analyst:] Absolutely.

[Prosecutor:] And is this relied upon by the scientific community?

[Analyst:] Yes.

(Doc. 17-2 at 374–75).

The FDLE analyst further opined that, even though she extracted only a partial DNA profile from the sperm on the cervical swab, the frequency of occurrence for the match between Payne's DNA profile and the partial profile was also one in seven hundred billion. (Doc. 17-2 at 377).

Payne complains about trial counsel's failure to challenge both the reliability of DNA testing generally and the reliability of the calculation of the frequency of occurrence. Yet, both STR DNA testing and the Product Rule are generally accepted in the scientific community and based on reliable principles and methods. Morrow, 374 F. Supp. 2d at 61 ("Over the past decade, numerous federal courts in a variety of jurisdictions have analyzed whether the introduction of DNA evidence garnered from the FBI Laboratory's use of PCR/STR analysis comports with the requirements laid down in Daubert. These courts have been virtually unanimous in finding that the use of PCR[/STR] DNA testing is admissible, and many of these courts have taken judicial notice of the general reliability of such tests. . . . Given the weight of this authority, this Court concludes that, as a general matter, PCR/STR DNA

testing meets the strictures of Daubert and is admissible.") (collecting cases)[9]; United States v. Pritchard, 993 F. Supp. 2d 1203, 1212 (C.D. Cal. 2014) (holding that each of the Daubert factors supported the admission of expert testimony based on the Product Rule in part because "federal courts, as well as California courts applying the more restrictive [ ]Frye standard, have held that use of the product rule based on the FBI's DNA databases is generally accepted in the relevant scientific community").[10]

Also, both the Cellmark analyst and the FDLE analyst implemented quality assurance measures to ensure that the results were reliable. (Doc. 17-2 at 340–41, 362–64). Notably, the Cellmark analyst used a reagent blank and a positive and negative control to ensure that the equipment was not contaminated. (Doc. 17-2 at 340–41). And other analysts reviewed the

[9] PCR/STR refers to the use of Polymerase Chain Reaction (PCR) amplification in conjunction with STR analysis to conduct the DNA testing. PCR itself is not a method of DNA testing but rather a technique used to prepare a sample for testing. Id. at 54, 57.

[10] See also Overton v. State, 976 So. 2d 536, 553 (Fla. 2007) ("Under the first prong of the Frye test, there is strong evidence that the underlying scientific principle with STR DNA testing was generally accepted at the time of Overton's trial in 1999."); Lemour v. State, 802 So. 2d 402, 405 (Fla. 3d DCA 2001) ("Many courts have held that PCR analysis using STRs is a scientifically valid and reliable forensic technique and is generally accepted in the scientific community.") (collecting cases); Butler v. State, 842 So. 2d 817, 829 (Fla. 2003) ("Several Florida cases, as well as cases from other jurisdictions, have accepted use of the product rule.") (collecting cases).

Cellmark analyst's results. (Doc. 17-2 at 355). Likewise, three analysts, including a supervisor, reviewed the FDLE analyst's results. (Doc. 17-2 at 362–64). Both the Cellmark analyst and the FDLE analyst successfully completed biannual DNA proficiency testing and training courses. (Doc. 17-2 at 338–39, 360–61, 364). Notably, Payne has completely failed to support his claim with any evidence either that the Cellmark analyst and the FLDE analyst did not reliably conduct the DNA testing or that the FDLE analyst did not reliably calculate the frequency of occurrence with the Product Rule. Because only speculation supported Payne's claim, the post-conviction court did not unreasonably deny the claim. Aldrich v. Wainwright, 777 F.2d 630, 636 (11th Cir. 1985) ("Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation."). Consequently, the claim in Ground One and Sub-claim A of Ground Four are due to be **DENIED**.

## B. Ground Two

As Ground Two, Payne asserts that trial counsel deficiently performed by not objecting to testimony by the DNA experts. (Doc. 1 at 11). Payne does not support the claim with specific allegations and instead refers to ground two, ground three, and ground four in his motion for post-conviction relief.

(Doc. 1 at 11). In ground two ("Sub-claim A"), Payne asserted that trial counsel deficiently performed by not objecting to the DNA expert's qualifications and knowledge of the database used to form an opinion about the frequency of occurrence. (Doc. 17-12 at 13–20). In ground three ("Sub-claim B"), Payne asserted that trial counsel deficiently performed by not investigating and calling a DNA expert to testify for the defense. (Doc. 17-12 at 20–28). In ground four ("Sub-claim C"), Payne asserted that trial counsel deficiently performed by not objecting to the DNA expert's lack of knowledge of statistics. (Doc. 17-12 at 28–38). Because "[t]he § 2254 Rules . . . mandate 'fact pleading' as opposed to 'notice pleading,'" and because Payne fails to support the sub-claims in Ground Two with allegations, the sub-claims are facially deficient. Borden v. Allen, 646 F.3d 785, 810 (11th Cir. 2011). Even if the sub-claims were sufficiently alleged, the sub-claims are without merit.

**Sub-claim A**

As Sub-claim A, Payne asserts that trial counsel deficiently performed by not objecting to the DNA expert's qualifications and knowledge of the database used to form an opinion about the frequency of occurrence. (Doc. 17-12 at 13–20). The post-conviction court denied the claim as follows:

> Defendant alleges counsel "failed to timely and adequately object when the State's expert testified regarding the statistical analysis of a DNA match from a profile developed from evidence taken from the victim's rape kit." He argues the evidence would have been excluded because "the State never elicited testimony from its expert to show [and] demonstrate that [ ] the State's DNA expert had sufficient knowledge of the DNA database use[d] in [the] statistical analysis or what formula was used to perform the statistical analysis."
>
> This claim lacks merit. A "witness must identify the method used to calculate the frequency statistics so that the judge may determine whether the method used is generally accepted in the scientific community in accordance with Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)." Cruz v. State, 262 So. 3d 244, 249 (Fla 2d DCA 2018). Ms. Varan testified that she used the Product Rule, "which has been recognized in Florida as a generally accepted method of DNA calculations." Thomas v. State, 22 So. 3d 626, 626 (Fla. 1st DCA 2009). Both Ms. Templin and Ms. Varan testified about their educational background and training as well as their work for accredited laboratories in the field of forensic DNA analysis. Their testimony established that they had sufficient knowledge of the DNA database used in statistical analysis as well as the applicable formulas. Therefore, counsel had no basis to object.
>
> (Doc. 17-12 at 165–66) (state court record citations omitted).

The Cellmark analyst testified that she earned a bachelor's degree in forensic science and a master's degree in forensic DNA and serology and took courses

in genetics, molecular genetics, statistics, and biology. (Doc. 17-2 at 337–38). Also, she attended continuing education every year, worked as a DNA analyst for eight years, and had been qualified as an expert in forensic testing and DNA analysis eleven times in a Florida court. (Doc. 17-2 at 336–38, 341). The FDLE analyst testified that she earned a bachelor's degree in forensic science with a minor in chemistry and molecular biology and completed additional courses related to DNA testing. (Doc. 17-2 at 360). Also, she attended continuing education courses every year, worked for FDLE as an analyst for twenty-one years, used STR DNA analysis for nineteen years, and had been qualified as an expert in forensic DNA analysis and forensic serology in a Florida court. (Doc. 17-2 at 359–60, 362, 364–65). This record reflects that the witnesses were sufficiently qualified to provide the testimony that they gave, and Payne identifies no basis for trial counsel to have objected to their testimony.

Because the Cellmark expert did not testify about the frequency of occurrence, an objection to her qualifications to testify about the frequency of occurrence and the database used to determine the frequency of occurrence would not have succeeded, and trial counsel did not deficiently perform. Pinkney v. Sec'y, Dep't of Corr., 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n

attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief."). Also, because Payne has failed to point to any evidence that the FDLE expert lacked the qualifications and knowledge to testify about the frequency of occurrence, only speculation supports the claim. Aldrich, 777 F.2d at 636. Consequently, Sub-claim A in Ground Two is due to be **DENIED**.

**Sub-claim B**

As Sub-claim B, Payne asserts that trial counsel deficiently performed by not investigating and calling a DNA expert to testify for the defense. (Doc. 17-12 at 20–28). The post-conviction court denied the claim as follows:

> Defendant alleges counsel failed to investigate and call an independent DNA expert witness to conduct additional testing and testify at trial, so that during closing, counsel could argue the unreliability of the State's DNA evidence.
>
> This claim lacks merit for the reasons set forth in the ruling on [the earlier grounds]. There is no reasonable probability that a defense DNA expert would have testified to different statistical results. Furthermore, after the State rested its case, the Court conducted the following colloquy with Defendant, which demonstrates that Defendant agreed with counsel's decision not to call additional witnesses:
>
> The Court: All right. Now, Mr. Armstrong has indicated he's going to call Mr.

| | |
|---|---|
| | Garrett as a defense witness. |
| Defendant: | Yes, sir. |
| The Court: | And that's the only witness he's going to call on behalf of the defense. Is that your understanding? |
| Defendant: | Yes, sir, it is. |
| The Court: | Is there anybody else you want him to call? |
| Defendant: | No, sir. There isn't. |
| The Court: | Are there any exhibits you wanted him to introduce that he's not going to introduce? |
| Defendant: | No, sir. There's not. |
| The Court: | All right. Are you satisfied with both Mr. Armstrong and Mr. Mackoul's representation of you in this case so far? |
| Defendant: | Yes, sir. |

Defendant is bound by these statements, which he made under oath.

(Doc. 17-12 at 166) (state court record citations omitted).

"[The] burden is particularly 'heavy where the petitioner alleges ineffective assistance in failing to call a witness because often allegations of what a witness would have testified to are largely speculative.'" McKiver v. Sec'y, Fla. Dep't of Corr., 991 F.3d 1357, 1365 (11th Cir. 2021) (quoting Sullivan v. DeLoach, 459 F.3d 1097, 1109 (11th Cir. 2006)). "[F]or that reason, [the Eleventh Circuit] [has] held that a petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish prejudice from the failure to interview or call that witness." McKiver, 991 F.3d at 1365 (citing Sullivan, 459 F.3d at 1109). Because Payne fails to support his claim with an affidavit or testimony by an expert to demonstrate that the expert would have rebutted the opinion by the prosecutor's expert, only speculation supported his claim. As such, the post-conviction court did not unreasonably deny the claim. Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978)[11] ("[C]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely

[11] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

speculative.”). Consequently, Sub-claim B in Ground Two is due to be **DENIED**.

**Sub-claim C**

As Sub-claim C, Payne asserts that trial counsel deficiently performed by not objecting to the DNA expert’s lack of knowledge of statistics. (Doc. 17-12 at 28–38). The post-conviction court denied the claim as follows:

> Defendant alleges counsel “failed to timely and adequately object when the State’s DNA expert testified regarding the statistical analysis of a DNA match for a profile developed from evidence taken from the victim’s rape kit.” He argues the State had failed to elicit the expert’s testimony that she was qualified to testify about the statistical analysis component of DNA testing or even to lay the proper predicate for admission of such testimony.
>
> This claim lacks merit for the reasons set forth in the ruling on [the earlier claims]. Counsel had no basis to make such an objection, and there is no reasonable probability that the outcome of the trial would have been different if he had done so.
>
> (Doc. 17-12 at 166–67) (state court record citations omitted).

As previously noted, because the Cellmark expert did not testify about the frequency of occurrence, an objection to the Cellmark expert’s lack of knowledge about statistics would not have succeeded, and trial counsel did not deficiently perform. Pinkney, 876 F.3d at 1297. Also, the FDLE analyst earned

a bachelor's degree in forensic science with a minor in chemistry and molecular biology, completed additional courses related to DNA testing, worked for FDLE as an analyst for twenty-one years, used STR DNA analysis for nineteen years, and had been qualified as an expert in forensic DNA analysis and forensic serology in a Florida court. (Doc. 17-2 at 359–60, 362, 364–65). Payne fails to identify or provide any evidence that the FDLE analyst lacked sufficient knowledge of statistics to testify about the frequency of occurrence, and, as such, only speculation supports his claim. Aldrich, 777 F.2d at 636. See also Darling v. State, 808 So. 2d 145, 158 (Fla. 2002) ("[T]he expert testified regarding the general acceptance in the scientific community of the methodology used, and demonstrated his knowledge and experience regarding both the methodology and the databases employed. The fact that he was not, himself, a statistician is not a sound basis to exclude his expert testimony regarding the statistical results."). As such, the post-conviction court did not unreasonably deny the claim. And Sub-claim C and all the sub-claims in Ground Two are due to be **DENIED**.

**C. Ground Three**

As Ground Three, Payne asserts that trial counsel deficiently performed by not moving for a mistrial and by not requesting a curative instruction after

the prosecutor improperly bolstered the DNA expert's credibility. (Doc. 1 at 13). The post-conviction court denied the claim as follows:

> Defendant alleges counsel failed to object, move for a mistrial, or request a curative instruction when the State's witness, Emily Varan, testified "to the qualifications, review process (reports and forms signed), and agreement with other employees alleged to be experts who did not testify," which improperly bolstered the credibility of Ms. Varan's testimony.
>
> This claim lacks merit. In Linn v. Fossum, 946 So. 2d 1032 (Fla. 2006), the Florida Supreme Court ruled:
>
>> We conclude that referring to consultations with other experts creates the danger of bolstering the credibility of the testifying expert's opinion without providing the opposing party the ability to effectively cross-examine the expert as to the basis for the opinion. Allowing the expert to testify on direct examination that he or she relied on consultations with other experts creates 'too much of a possibility of an inference being drawn that these experts agreed' with the testifying expert. We therefore hold as a matter of law that under the Florida Evidence Code an expert is not permitted to testify on direct examination that the expert relied on consultations with colleagues or other experts in reaching his or her opinion.
>
> Telfort v. State, 978 So. 2d 225, 226–27 (Fla. 4th DCA 2008).

> Ms. Varan testified that her work is reviewed by another qualified DNA analyst, who signs a form indicating agreement, then her written report is reviewed by another DNA analyst called a technical reviewer, then finally a supervisor does an administrative review before the report is released. The State elicited this testimony at the start of her direct examination, while asking about her training, to establish the lab's compliance with quality control procedures. Ms. Varan had not yet described the analysis she conducted in this case, nor had she testified to any opinions she formed or conclusions she reached. Most significantly, she never indicated that she relied on consultations with her colleagues to reach those opinions and conclusions.
>
> Ms. Varan's testimony regarding peer review procedures did not constitute improper bolstering. Therefore, counsel had no basis to object, move for a mistrial, or request a curative instruction, and there is no reasonable probability that the outcome of the trial or appeal would have been different if he had done so.
>
> (Doc. 12-12 at 167–68) (state court record citations omitted).

Having reviewed the record, the Court finds that the post-conviction court erroneously determined that the FDLE expert testified about the peer review of her results only in the beginning of her testimony and only to establish that the FDLE laboratory implemented quality assurance measures. Also, the post-conviction court erroneously determined that the FDLE expert "never indicated that she relied on consultations with her colleagues to reach

[the] opinions and conclusions" in this case. On direct examination, after the FDLE expert testified that Payne's DNA profile matched the DNA profile from the semen on the vaginal swab and the partial DNA profile from the semen on the cervical swab, the prosecutor asked if her results were peer reviewed:

> [Prosecutor:] Now, did that complete your analysis with regards just to the vaginal swab in terms of DNA analysis?
>
> [Analyst:] Yes.
>
> [Prosecutor:] And, Ms. Varan, did you then—let me back up. Was that particular work peer reviewed [as] much as you described earlier in your testimony?
>
> [Analyst:] Yes.
>
> [Prosecutor:] Now, were you later then asked to perform DNA analysis, STR analysis on the cervical swab that was obtained from the sexual assault kit from [M.T.]?
>
> [Analyst:] I was.
>
> [Prosecutor:] And did you go through the same procedures that you just described in regards to the STR DNA analysis of the cervical swab?
>
> [Analyst:] I did.

. . .

[Prosecutor:] And did you then once again generate a report in regards to your analysis of the cervical swabs and your findings?

[Analyst:] I did.

[Prosecutor:] And was that report also reviewed and peer reviewed?

[Analyst:] It was.

[Prosecutor:] And was there any concern, either one of these reports and testing, for [ ] contamination?

[Analyst:] No.

(Doc. 17-2 at 375–78).

The trial transcript clearly and convincingly rebuts the post-conviction court's factual determinations, and no reasonable jurist would agree with those factual determinations. 28 U.S.C. § 2254(d)(2) and (e)(1). Raleigh v. Sec'y, Fla. Dep't of Corr., 827 F.3d 939, 948–49 (11th Cir. 2016) (citing Brumfield v. Cain, 576 U.S. 305, 313–14 (2015)). Because the post-conviction court's decision, taken as a whole, constitutes an unreasonable determination of facts, this Court reviews the claim de novo. Curry v. Warden, 185 F.4th 1110, 1117 (11th Cir. 2026).

Even if trial counsel deficiently performed by failing to object to the prosecutor's improper bolstering of the FDLE expert, Payne cannot demonstrate prejudice under Strickland. Certainly, even if trial counsel had successfully objected to the FDLE expert's testimony about the peer review, the prosecutor still would have introduced the results of the DNA testing into evidence at trial. Indeed, the jury would have still learned that the DNA profile from the sperm on the vaginal swab and the partial DNA profile from the sperm on the cervical swab matched Payne's DNA profile. Moreover, the jury would still have learned that the frequency of occurrence for both DNA matches was one in seven hundred billion persons. And the jury would still have learned about other compelling circumstantial evidence of Payne's guilt, including that Payne left the motel that evening in Garrett's car and never returned, that M.T.'s description of the car that the perpetrator drove was remarkably similar to the description of Garrett's car, and that a key to M.T.'s home was inside Garrett's car.

Also, at trial, on direct examination, the FDLE expert explained the purpose of peer review:

> [Prosecutor:] So, Ms. Varan, if there was an error or some sort of question in regards to the results of a case you were

working, is there a policy in place for how to deal with that?

[Analyst:] Yes.

[Prosecutor:] And could you briefly explain that to the jury?

[Analyst:] Yes. If—well, scientists sometimes disagree, so you know if somebody is not clear on—the reviewer is not clear what you have done or why you did something, they will ask and that's part of the technical review process, or if they thought you need to go back and do additional work, they would recommend that as well, so it's things of that nature.

Sometimes typos, if they can't read your handwriting, which a lot of people write, and it looks like chicken scratch. So, if they need clarity in that. It's things of that nature, and we have [a] certain format—report format and reporting segments that we use. So, if we make a typo in the report, or misspell something, or the grammar isn't proper, they'll kick that back, too.

(Doc. 17-2 at 363–64).

Notably, the defense did not introduce any evidence demonstrating that the FDLE expert either made a mistake or failed to take a critical step while

conducting the DNA testing and calculating the frequency of occurrence. Instead, during cross-examination, the FDLE expert conceded that a DNA analyst could have tested the swabs in 1996, conceded that she did not discover any fully intact sperm on the swabs and only discovered sperm heads, and conceded that she examined the DNA from the vaginal swab only for fifteen loci and did not rely on newer technology that permits examination of male DNA for twenty-three loci. (Doc. 17-2 at 372–73, 381–84). And because the defense did not present any expert testimony to rebut the testimony by the FDLE expert, the jury was not tasked with settling a dispute between two experts. Moreover, the unrebutted DNA evidence convincingly impeached Payne's statement to the detective that he neither knew nor ever engaged in sex with M.T. (Doc. 17-2 at 321–25). § 90.806(1), Fla. Stat. Lastly, during closing, the prosecutor did not refer to the FDLE expert's testimony about peer review. (Doc. 17-2 at 429–32, 449–51, 453, 456–59).

Because the defense did not challenge the reliability of the methods implemented by the FDLE expert and challenged only the quality of the DNA sample and the reliability of the technology used to analyze the DNA sample, and because the testimony about peer review did not bolster the FDLE expert's credibility over a competing defense expert's credibility, Payne fails to

demonstrate a reasonable probability that the outcome would change if trial counsel had objected. Cox v. McNeil, 638 F.3d 1356, 1364 (11th Cir. 2011); Dorsey v. Chapman, 262 F.3d 1181, 1186 (11th Cir. 2001). Consequently, the claim in Ground Three is due to be **DENIED**.

### D. Sub-claim B of Ground Four

As Sub-claim B of Ground Four, Payne asserts that trial counsel deficiently performed by misadvising him about his right to testify. (Doc. 1 at 15). The postconviction court denied the claim as follows:

> Defendant alleges counsel (A) failed to investigate and research the law relating to Section 90.610, Florida Statutes, which led counsel to misadvise him about the extent of the State's cross-examination into the details of his criminal history. He argues this led him to make an involuntary and unknowing waiver of his right to testify. He also alleges counsel (B) failed to investigate and research the law of anticipatory rehabilitation and inform him of its use as a possible option. He argues this led him to make an involuntary and unknowing waiver of his right to testify.
>
> Defendant claims counsel told him the State would be able to "expose the nature and details of his prior convictions and entire criminal history" if he testified at his trial. He also claims counsel failed to inform him of the necessity to testify to support "either of the aforementioned defenses" and failed to prepare him to testify.
>
> This claim lacks merit. The Court reminded Defendant that if he took the stand, the State would have the

> right to impeach him with any prior felony convictions and crimes involving dishonesty, but specifically advised him that if he answered correctly with regard to the number of times he had been convicted, the State could not go into the details of the prior crimes. Defendant indicated that he understood and that after consulting with counsel, he had decided not to testify. This is sufficient to refute his allegations [supporting the claim] and establish that he waived his right to testify knowingly, intelligently, and voluntarily. Having been specifically advised by the Court, he was not entitled to rely on any contrary advice that counsel allegedly gave him.
>
> (Doc. 17-12 at 168–69) (state court record citations omitted).

After the prosecutor rested his case, the trial judge conducted a colloquy with Payne under oath about his right to testify:

> [Trial judge:] All right. Mr. Payne, the Court has now heard all the evidence in this case from the State. Do you understand that it's the State's burden to prove the charge against you beyond a reasonable doubt?
>
> [Payne:] Yes.
>
> [Trial judge:] And, as such, you do not have to prove or disprove anything in this case. Do you understand that?
>
> [Payne:] Yes, I do.
>
> [Trial judge:] As such, you do not have—you have the right to not testify—let me—

| | |
|---|---|
| | yeah. That's right. That's—you have the right to not testify in this case. You have the absolute right to remain silent. Do you understand that? |
| [Payne:] | Yes, I do. |
| [Trial judge:] | Of course, you also have the absolute right to testify in this case, if you choose to do so. Do you understand that, as well? |
| [Payne:] | Yes, sir. |
| [Trial judge:] | The decision to testify or not to testify is yours and yours alone to make. Do you understand that? |
| [Payne:] | Yes, I do, sir. |
| [Trial judge:] | You have two experienced lawyers who are representing you, Mr. Armstrong and Mr. Mackoul. You should certainly consider their advice to you with respect to questioning whether or not you should testify or not, but the ultimate decision is yours. Do you understand? |
| [Payne:] | Yes, I do, sir. |
| [Trial judge:] | If you choose not to testify, I will instruct the jury that in every criminal case, the defendant has the absolute right to remain silent and they are not permitted, that is the |

| | |
|---|---|
| | jury [is] not permitted to draw any inference of guilt from your exercising of your right to remain silent. Additionally, I will tell them that the fact that you did not take the witness stand must not influence their verdict in any manner whatsoever. Do you understand that? |
| [Payne:] | Yes, sir, I do. |
| [Trial judge:] | If you do choose to testify, you'll be treated like any other witness. You'll be placed under oath, and you'll take the witness stand to be examined by the State Attorney. Also, if you have any convictions for any felonies, [or] crimes involving dishonesty, the State will be permitted to impeach your credibility with those certified judgments. Do you understand that? |
| [Payne:] | I kind of missed that little end of that because my counsel was— |
| [Trial counsel:] | Sorry, Your Honor. |
| [Trial judge:] | That's okay. I can ask that again. If you do choose to testify, you're going to be treated like any other witness, that is you're going to be placed on the witness stand, placed under oath, first examined by your lawyer [on] direct examination, and then cross-examined by the State. The |

| | |
|---|---|
| | State would have the right to impeach your credibility with any prior convictions for felonies or any crimes involving dishonesty. Do you understand that? |
| [Payne:] | Yes, sir, I do. |
| [Trial judge:] | And for the record, do we have any such prior impeachable offenses for Mr. Payne? |
| [Trial counsel:] | There are prior felony convictions, Your Honor. |
| [Prosecutor:] | I believe there would be one prior impeachable felony conviction for Mr. Payne. |
| [Trial judge:] | And no crimes involving dishonesty? |
| [Prosecutor:] | No, Your Honor. |
| [Trial judge:] | All right. So, Mr. Payne—Mr. Armstrong, you agree that he would have at least one prior felony conviction? |
| [Trial counsel:] | I would agree—I would agree with at least one, yes. |
| [Trial judge:] | All right. Mr. Payne, you agree as well? |
| [Payne:] | Yes. |
| [Trial judge:] | All right. So, the State would be able to impeach your credibility with the |

| | |
|---|---|
| | fact that you've been a previously convicted felon one time, and if you answer that question yes, I have one prior felony conviction, they couldn't go into the details as to what that crime would be. You understand that? |
| [Payne:] | Yes, sir, I do. |
| [Trial judge:] | All right. Now, have you had enough time to speak with Mr. Armstrong or Mr. Mackoul about your decision to testify or not? |
| [Payne:] | Yes, I have. |
| [Trial judge:] | Have they answered all of your questions regarding that? |
| [Payne:] | Yes, they have. |
| [Trial judge:] | And have you decided whether [ ] you wish to testify or not? |
| [Payne:] | I will not testify, sir. |
| [Trial judge:] | You will not. So, have you had enough time to speak about that with them? |
| [Payne:] | Yes, I did. |
| [Trial judge:] | Has anyone promised you anything to get you to make that decision? |
| [Payne:] | No, sir. |

[Trial judge:] Are you making that decision freely and voluntarily and [ ] intelligently?

[Payne:] Yes, sir.

(Doc. 17-2 at 388–92).

At the end of the trial, the trial judge instructed the jury that Payne was presumed innocent, did not have any burden of proof, and had the right to not testify at trial, that a juror must not construe his failure to testify as an admission of guilt, and that his failure to testify must not influence the juror's verdict in the case. (Doc. 17-2 at 463–64, 466–67). Because the Court presumes that the jury followed the instructions, because Payne's sworn statements during the colloquy refute the ineffective assistance of counsel claim, and because Payne's testimony would not have convincingly rebutted the compelling DNA evidence supporting the finding that he sexually battered M.T., the post-conviction court did not unreasonably deny the claim. Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); United States v. Siegelman, 640 F.3d 1159, 1184 (11th Cir. 2011)

("The jury is presumed to follow the district court's instructions."). Consequently, Sub-claim B in Ground Four is due to be **DENIED**.

## VII. Certificate of Appealability Pursuant to 28 U.S.C. § 2253(c)(1)

If Payne seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Payne "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason

would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1. The Petition (Doc. 1) for a Writ of Habeas Corpus is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2. The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3. If Payne appeals the denial of the Petition, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

4. The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this 21st day of September, 2026.

MARCIA MORALES HOWARD
Chief United States District Judge

cc: Terrence Keith Payne, #546332
Counsel of Record